## BRIDGEPORT BRASS CO. v. FORD MOTOR CO.

(Circuit Court of Appeals, Sixth Circuit. February 7, 1922.)

No. 3598.

Patents ☞328—1,125,229, for filler tube cap for automobile radiators, held void for lack of invention.

The Webster patent, No. 1,125,229, for filler tube cap for automobile radiators, assuming that the patentee, and not defendant, was the originator of the device, *held* void for lack of invention, as being merely the reproduction in sheet brass of caps theretofore made in brass by casting without material change.

Appeal from the District Court of the United States for the Eastern District of Michigan; Andrew M. J. Cochrane, Judge.

Suit in equity by the Bridgeport Brass Company against the Ford Motor Company. Decree for defendant, and complainant appeals. Affirmed.

Henry E. Rockwell, of New Haven, Conn. (Stuart C. Barnes, of Detroit, Mich., on the brief), for appellant.

Homer C. Underwood and Otto F. Barthel, both of Detroit, Mich. (Barthel, Flanders & Barthel, of Detroit, Mich., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Suit for infringement of patent No. 1,125,229, January 19, 1915, to William R. Webster, assignor to plaintiff, on filler tube cap for automobile radiators. This appeal is from a decree finding the patent invalid and dismissing the bill.

The alleged invention grew out of an order given by defendant to plaintiff for a large quantity of the filler caps which have been used on Ford automobiles for several years past. The defenses, so far as need be stated, are that defendant, and not Webster, designed the cap, and that there is otherwise lack of invention. The District Court found both of these issues for defendant. The patent contains four claims; the second and fourth being principally relied upon. The fourth claim, which is the most detailed, is as follows:

"As an article of manufacture, a filler tube cap comprising a cylindrical side wall, a dome-shaped top, and hollow wings struck up from the downwardly slanting portion of the dome remote from the center thereof, and having substantially upright outer walls or edges adjacent the periphery of the cap, and upper edges or walls inclined downwardly toward the summit of the dome, substantially as described."

This claim, in connection with the specification, clearly contemplates a cap formed from sheet metal. The other claims so specify in terms. The outstanding facts are these:

For three years or more before the order in question defendant's filler cap was a solid sand casting of the size and general form of the sheet-metal cap in controversy. It had a cylindrical side wall, a dome-shaped top, four equidistant gripping wings projecting upwardly from the top of the dome, extending to a point remote from the center thereof; their outer upright edges extending substantially to the periphery of the cap. In 1910 plaintiff, which was then manufacturing certain other automobile parts for defendant, designed a proposed filler cap having a flatly arched top overhanging the cylindrical portion, and solicited from defendant an order therefor, which was refused. In 1911 plaintiff made another proposed design of cap for defendant—this one having an octagonal-shaped top. Defendant rejected this design also, refusing to accept anything not having the gripping wings of its device then in use. On April 30, 1912, plaintiff, through its traveling salesman, took from defendant a written order for 19,000 caps, referred to as "brass stamping, sheet brass No. 14," and otherwise detailed. The caps made and delivered under this order form the subject-matter of the alleged invention.

The patentee (Webster), who was plaintiff's vice president and general superintendent of its plant, testified that he designed the cap in question. His testimony is unconvincing and unsatisfactory. It is established, and seems now to be conceded, that plaintiff made no drawings, nor even so much as a sketch of the cap, although careful drawings had been made of both the 1910 and 1911 (rejected) designs. The only substantial explanation of this failure to make drawings or a sketch, attempted in plaintiff's brief, is that the cap was already patented. In fact, patent was not applied for until nearly a year later, and did not issue until January 19, 1915. Plaintiff's mechanical superintendent, who made the sheet-metal cap, says that he was furnished no drawings, but thinks he was given a blueprint of defendant's drawing. He also says that Webster gave him one of defendant's cast caps and told him to reproduce it in sheet metal. There is no satisfactory evidence to the contrary. The statement of plaintiff's mechanical superintendent is persuasively supported by the express reference in defendant's written order in question to "symbol T 1103B," which plainly means defendant's filler cap drawing so marked. This drawing, as produced upon the trial, is marked "radiator filling flange cap * * * sheet brass—dead soft," etc., and is substantially, if not precisely, the design of the cap in suit. This drawing was originally made, as shown by notation thereon, March 13, 1909, and was revised on April 13, April 22, and July 20, 1909, and on April 4, 1912, and September 21, 1914 (the last date being after the order in question), and therefore the drawing alone does not necessarily prove that on April 30, 1912, it represented the sheet-metal design now shown.

But there is other testimony supporting what seems the inherent probability that the drawing referred to in the order given by defendant to plaintiff was of a cap of that character. The record is convincing that, when defendant adopted this filler cap for its model "T" car in 1907, it had designed and manufactured about 75 stamped metal caps, and put them experimentally upon a few of its cars; that they were not satisfactory, for the reason that they leaked to some extent; and that for this reason the cast cap was soon after adopted. The drawing (T-1103) for a "yellow brass-casting" cap is produced, and shows the making of the original drawing December 15, 1907, and revisions on August 8, August 10, and December 7, 1908; the last revision being on March 17, 1909. This drawing differs but slightly from the design of the brass-casting cap furnished plaintiff by defendant as model for the sheet-metal cap; the difference being in the detailed form of the gripping wings which extend from the dome. The nature of the revision of August 10, 1908, is shown in "drafting room record of changes" of that date (which we are satisfied relates to the filler cap), as follows: "Changed from brass stamping to brass casting and revised." The nature of the revision of July 20, 1909, of the drawing "T 1103 B" is shown by the "drafting room record of changes" as follows: "Removed note—use after first 2,500 cars"—which notation was upon the drawing, which, as already said, now shows the sheet-metal cap, and is in harmony with the change of August 10, 1908, relating to drawing "T-1103" showing the "yellow brass casting."

Moreover, defendant produced four samples of sheet-metal filler caps, which are testified, by witnesses having apparent means of knowledge, to be samples of defendant's original sheet-metal caps, referred to as antedating the brass casting cap. One of these caps in particular (Exhibit 17A) is identified as taken at the time of giving of testimony herein from an old "pump radiator," which was at an early period (apparently about 1907 or 1908) superseded by the "thermo-siphon type." There is testimony tending to discredit the authenticity of each of these four samples; but whether or not, as to the others, the testimony of identity will stand the rigid test required, the identification of Exhibit 17A cannot well be discredited, except on the theory of willful perjury and active fraud, which does not commend itself to our judgment. In addition to the identification of 17A (as taken from the pump radiator) made by defendant's "foreman of the maintenance stock," there is the testimony of defendant's factory manager (since 1903) to the effect that the sheet-metal cap with struck-up lugs first made by defendant was substantially identical with Exhibit 17A; also the testimony of defendant's present engineer (who was manager of the Keim Mills, of Buffalo, until it was taken over by defendant in 1912, which company is testified to have made defendant's sheet-metal caps in 1907 and 1908) to the effect that Exhibit 17A is of the kind then made by Keim Mills.

Taking into account the entire history of the case, both oral and written, including the drawings and the drafting room records of changes, we have no doubt that defendant actually designed and used sheet-metal caps in 1907 and 1908; that the use of such caps was suspended only because of their imperfect workmanship; that defendant never abandoned the intention to revert to the sheet-metal cap when it could get satisfactory manufacture thereof, and that such preliminary and experimental use as was had was not an abandoned experiment within the applicable law; and while the identity of the old cap (Exhibit 17A) is not demonstrated beyond all peradventure, a careful consideration of the entire record impresses us that there is no good reason to doubt its authenticity. Defendant continued buying filler caps from plaintiff for a year or two after the contract of April 30, 1912. Since that time it has bought from other manufacturers, including the Diamond Company. While the caps of these various manufacturers, so far as shown, including that of plaintiff and that of Exhibit 17A, are of the same general form and appearance, and fully meet the claims of the patent, the workmanship is not identical. Plaintiff's manufacture is, in that respect, readily distinguishable from that of either the Diamond Company or the manufacturer of the cap marked "H. E. R."; there being testimony that the latter is inferior in workmanship to either of the other two. Exhibit 17A is likewise, to our minds, readily distinguishable in point of workmanship from either of the three last mentioned. We find no satisfactory testimony as to its manufacture by any company from whom defendant is shown to have bought since it ceased buying of plaintiff.

If however, we have given too much credence to the proof of identity of Exhibit 17A, it is otherwise clear that no invention on Webster's part was involved in the design in question. So far as Webster's

participation in the manufacture of the sheet-metal filler cap from the brass casting model is concerned, the only testimony that impresses us as of value is that of plaintiff's mechanical superintendent, who says that Webster gave him the brass-casting model and told him to "reproduce it in sheet metal, * * * and explained how he wanted it made"; but there is no satisfactory evidence that such explanation related to anything, except the purely mechanical methods involved in making the dies and the "cut and try" processes for reproducing the metal cap with struck-up lugs from the model of the cast cap. On the contrary, the testimony as to the nature of the problem presented is convincing that it involved only "cutting and trying," and that reproduction in sheet metal of devices theretofore made in brass by casting is an ordinary mechanical operation.

But whether or not Webster or plaintiff's mechanical superintendent should, as between them, be credited with whatever invention might be thought to reside in the designing and construction of the cap in question, we think no invention whatever on the part of any one connected with plaintiff company is involved therein, even though changes in method of construction and form were involved, and although the sheet-metal construction possesses advantages over the cast-metal construction, due merely to the inherent advantages of the material used. In the last analysis, the conception involved merely the substitution of sheet metal for cast metal. This change rendered the product cheaper, lighter, and stronger with respect to weight, but it did not change the mode of operation of the cap or otherwise increase its utility. It involved no new discovery of results to be secured by the change to sheet metal or of the properties of that substance. The patent is not for a design. Sheet-metal stamping was not only old, but it had become merely a mechanical art. We content ourselves with referring to several confirmatory decisions of this court. Strom Mfg. Co. v. Weir Frog Co., 83 Fed. 170, 27 C. C. A. 502; Drake Co. v. Brownell, 123 Fed. 86, 88, 59 C. C. A. 216; Wise Soda Apparatus Co. v. Bishop, etc., Co., 240 Fed. 733, 736, 153 C. C. A. 531; Wagner v. Meccano, Ltd., 246 Fed. 603, 607, 158 C. C. A. 573.

The only respects in which the design of the sheet-metal cap can be said to differ appreciably from the cast-metal cap is that in the latter the dome is less flattened and the gripping wings are not carried above the plane of the top of the dome, and so the upper arm of the wing does not slant downward to meet the dome. If Webster devised anything, it was merely the idea of striking the wings up to a higher point; but this, in our opinion, was not invention. It involved no substantial change in either means or result. Wagner v. Meccano, supra, 246 Fed. at page 608, 158 C. C. A. at page 579. He introduced no new idea of a gripping feature, and it is not clear that carrying the wings higher has materially added to the strength or effectiveness of the grip. For all that satisfactorily appears, the carrying of Webster's radial wings higher than in the cast sample was only incidental to methods employed in striking up from sheet metal.

Throughout the record the sheet-metal cap of the patent is spoken of as substantially a reproduction of the cast metal cap. One of the

prominent witnesses for plaintiff compares defendant's cast cap with Exhibit 48 (which is one of the sheet-metal caps claimed by defendant to have been of a design antedating the cast cap) by saying, "It was a cap similar, but of cast construction, the lugs not being struck up on the top, but simply cast in a mold," and that defendant's cast cap "was of about the same appearance as the one used to-day, except that it was a casting, instead of a stamping, and that the ears on top of the cap were thinner than the ears of the stamping, that is, in width across the base of the ear"; and Webster, when asked to state the material differences between defendant's cast cap and the sheet-metal sample, claimed to have been made by plaintiff and submitted to defendant as basis of the order, said, "It had hollow wings, instead of solid ones, thinner and lighter; more highly finished."

There is no claim that this sample differed materially, if at all, from the device of the patent. Other facts tending strongly to negative invention are the delay in applying for patent, that it is not claimed that notice of the fact of application therefor was ever given defendant, either directly or by so stamping the manufactured articles, or that defendant had any knowledge of the application for patent until after its issue (January 19, 1915), and after it had for apparently a year or so been having similar caps manufactured by others. Under the circumstances which appear in this record, a conclusion that defendant is pirating the rights of plaintiff is against reason.

It follows from these views that plaintiff's bill was rightly dismissed, and the decree of the District Court is accordingly affirmed.