## HERMAN NELSON CORPORATION v. JOHN J. NESBITT, Inc., et al.

### No. 4568.

District Court, E. D. Michigan, S. D.
Oct. 12, 1933.

Banning & Banning, of Chicago, Ill., and Francis D. Hardesty, of Detroit, Mich., for plaintiff.

Toulmin & Toulmin, of Dayton, Ohio, and Ralph E. Routier, of Detroit, Mich., for defendants.

TUTTLE, District Judge.

This is an equity suit involving re-issued patent No. 18374 to W. Shurtleff of March 1, 1932. It has to do with unit heating and ventilating structures. As usual, the bill alleges title validity and infringement, and, as usual, the defendant pleads invalidity and noninfringement. There are other defenses. The reissue feature presents unusual problems which might be considered, but I accept the patent in the form in which it was re-issued, with the presumption of validity surrounding it.

There is the somewhat unusual defense as to whether or not Shurtleff was the man who really made the invention, or whether a letter received by his company prior to the application and about the time he claims to have conceived the invention was the real source of his claimed discovery. There are many things which indicate that the germ of the idea came from that letter. The memory of men as to dates is likely to err unless fixed by written records. All there is here in writing to show that the idea in Shurtleff's mind came in advance of the letter is the figure "9" where the date is written on the drawing as "9–14–22." If that date were 10–14–22, it would be after the letter. The drawing and the date are in pencil. The letter which was received by Shurtleff's company told the whole story later told in the application filed by Shurtleff so far as anything is involved of importance in this art. The information given in that letter comes nearer to describing what is now being used successfully in the art than is told by the patent in suit. It is unpleasant to discuss the memory and veracity of witnesses. It is not necessary to do that in order to decide this case. This much is certain, that the author of the letter did not get his ideas from Shurtleff. The letter suggests how natural and easy it was to place a so-called light-weight radiator in the unit construction, if one wanted to make the structure lighter and smaller. The British patent to Raw, No. 12340, dated June 13, 1899, explains how these light-weight radiators could be used in this art. To the same effect are the British patents to Masquet, No. 17085 of August 8, 1898, Stott No. 26795 of 1896, and Lake No. 14090 of 1901. The letter above referred to tells how the tubes or pipes could be made of copper. Those copper tubes, either cylindrical or wedge shape, with fins, seem to serve the purpose in the most satisfactory manner.

If the patent were to have value and breadth worth-while, it would be for a radiator of light weight as compared with cast iron, with a fan below the radiator, an intake for air from the outside below the radiator, a passageway for cold air around the radiator, a passageway for air through the radiator so that it could be heated, and a discharge for the air vertically and at high velocity to the ceiling of the room. In defining the radiator as one element of the combination, Shurtleff uses comparative language describing it as "relatively light." In the same way as to dimensions, he uses comparative words which can only have meaning when some old use is read into the claim. The court is urged to read into the claims the meaning that the radiator is lighter than the old cast-iron radiators, and that it is of smaller dimensions than the old cast-iron radiators. This use of words in a patent is to be condemned. I criticized a similar use in the balloon tire case. Steel Wheel Corporation v. B. F. Goodrich Rubber Company (D. C.) 27 F.(2d) 427. In order to construe a claim worded in such a manner, it is necessary to go back to the old art, not only for the purpose of determining validity, but, if the claim should be sustained, it would be necessary to go back to the old art and reinterpret the claim every time the question of infringement was involved. Those relative words, like "larger," "smaller," "lighter," "heavier," "thicker," and "thinner," are poor words to use in claims when the improvement claimed rests entirely upon the size or weight of the element in combination. A certain element in the old combination might be made very thick and heavy. If the practice of using comparative words is to be approved, a patent might claim the same combination except to make the one element thinner and lighter. Then along might come another inventor who could get a patent because he made that particular element still thinner and still lighter than the first. For the purpose of this discussion, I am now assuming that each new substitution of a thinner and lighter element did result in a new use and result. If the first one could get a patent by making the element relatively thinner and lighter, then the second applicant would be able to get his patent by using exactly the same language and simply saying that it was relatively thinner and lighter. In other words, we should have two patents in the same art, with claims in each reading exactly the same as to every word and every letter. If each reduction in size and weight as compared with the art at the date of the application had produced sufficient improvement, then there would be no more reason for denying the second patent than there

would for denying the first one. While I do not dispose of this case on the ground that the claims are indefinite, I do not wish to be understood as holding that particular defense without merit.

I disagree with the contention made by plaintiff to the effect that high velocity vertical discharge of air in a unit heating and ventilating system is an art all by itself, that the central heating and ventilating system is another art, and that the unit system of heating other than high velocity vertical discharge is a third art. This word "art" in the patent law has often been used in a way to confuse. We speak of the automobile art, the aeroplane art, the motorboat art, and the gasoline engine art. The gas engine art runs crosswise of the automobile art, the aeroplane art, and the motorboat art. These four so-called arts have very much in common, and in many cases it would be fairer to talk about the transportation art. To take something having to do with the gas engine of the automobile and use it in the gas engine of the motorboat is not a new use in a new art. Both uses were in the gas engine art. If the chancellor attempts to mark the boundaries of the various so-called arts by fixed lines, like the fences which surround a farm, and then grants a patent to any improvement which uses something from outside that little field, he is going to reach some result very unfair to the business man and the mechanic. It is the duty of the chancellor to weigh the thing done and the results produced. Some things are very difficult to find, although very near, and easy to see when others have pointed to them. We have difficulty in seeing the partridge which skulks near our feet. On the other hand, it may be a long way to the polar bear in the zoo, but any school boy can find the polar bear in the zoo. Columbus discovered a continent; nobody coming after him could discover that continent. It was left for De Soto to make inroads and discover the Mississippi river; others who came still later crossed the temperate zone with roads until it was impossible to discover anything more on the surface of the earth, and now they are looking for the hidden things, like oil and coal. The plaintiff would limit this art to such an extent that, if Shurtleff took something from a heating system found in a room adjoining the schoolroom to be heated, then he should be given credit for a new use. The fact that Shurtleff found a structure in the next room, blowing its air out into the schoolroom where the children were located, does not mean that he found it in a different art. It was in the same heating and ventilating art. It was not much more difficult for him to find it in the room adjoining the schoolroom where it was located with its nose stuck through the wall, blowing air into the schoolroom, than it would have been if it had been located in the schoolroom. It is a matter of being practical and a matter of doing justice to look into these things and decide whether they are the kind of things which would occur to any ordinary mechanic, or whether, on the other hand, it requires the genius of an inventor to discover them. The man who finds an oil well in a wildcat field discovers something, but the man who drills an offset well in a field where there are already many other wells is not a discoverer—he is a well digger.

This patent is not for a new combination. Herman Nelson Corporation of Moline, Ill. v. Columbus Heating & Ventilating Co., 11 F. (2d) 273 (C. C. A. 6); Buckeye Blower Co. v. Arensmeyer, Warnock & Zahrndt, 35 F. (2d) 733 (C. C. A. 2); Callahan v. Nesbitt, 1 F.(2d) 75 (C. C. A. 3). It is difficult to tell from reading the patent just exactly what Shurtleff finally decided to claim. That difficulty results from the fact that Shurtleff, when he made his application, did not have any correct idea as to what was old. So far as he thought out his own claims, they were entirely old in the art. Some of our most helpful inventors are those educated in the shops, but Shurtleff was lacking in understanding of the art in which he worked. The world to him was the piano-type heater and ventilator being made in the shop where he worked, and the things he thought he had discovered and invented were all old. He took an old automobile radiator and arranged it so that a fan could blow air through it. He did not pass steam or hot water through the radiator. In other words, he did not make an operative device before he applied for his patent. It was well known in the art that a radiator which could be used in the automobile art to cool the water within the radiator could be used in the heating art to heat the surrounding air. It was also well known that to increase heating surface would increase the capacity for heating. This was so well known that it was largely a matter of mathematics. Shurtleff was working on the wrong theory because he thought that in order to heat air successfully it was necessary to have resistance in the air current. When he made his so-called invention, he was attempting to get resistance in his hot-air current. His patent as well as his testimony discloses this desire. He was in error in this notion. What he claimed as an advantage was a misfortune to the art.

It is true that a smaller unit was desired. That desire is still with us. A heating unit which would properly heat and ventilate a room without occupying more space than the lady's thimble would be still more desirable than what we now have. Bigness is not a thing to be desired in heaters and ventilators. It is not a matter of taste, but just a matter of common sense. They are not purchased for the purpose of making the schoolroom more beautiful or for the purpose of making the aisles narrower. If the results could be accomplished as satisfactorily without having the thing in the room, it would be better. Every schoolboy who bumps his head against one of these units is still wishing it were smaller. It is not invention to make something smaller and lighter. Hill v. Wooster, 132 U. S. 693, 10 S. Ct. 228, 33 L. Ed. 502; American Road-Mach. Co. v. Pennock, 164 U. S. 26, 17 S. Ct. 1, 41 L. Ed. 337; Kilbourne v. W. Bingham, 50 F. 697 (C. C. A. 6); Strom Mfg. Co. v. Weir Frog Co., 83 F. 170 (C. C. A. 6); Wise Soda Apparatus Co. v. Bishop-Babcock-Becker Co., 240 F. 733 (C. C. A. 6); Bridgeport Brass Co. v. Ford Motor Co., 278 F. 881 (C. C. A. 6); Winters & Crampton Mfg. Co. v. Grand Rapids Brass Co. (C. C. A.) 62 F.(2d) 822; Central Brass Mfg. Co. v. Sterling Brass Co., 285 F. 135 (C. C. A. 6); Wagner v. Meccano, Ltd., 246 F. 603 (C. C. A. 6).

Undoubtedly this case could be disposed of on the ground of noninfringement. There is a wide departure from the patent in suit by both the plaintiff and the defendant in their successful commercial structures. The claims contain details which are not found in the defendant's structure. No one has ever used the structure shown by this patent in suit. No one wishes to use the transverse current of air which is emphasized in the patent. The defendant does not use the angle iron which the patent emphasizes as a cradle for the radiator. I am not inclined to narrow a patent down to a razor edge and then say it misses the defendant's structure because it is so narrow. Such a policy would not be of any real value to the owners of such patents, because the business world would make the slight changes necessary to avoid infringement. On the other hand, such a policy would be harmful to the business world. A worthless patent should not prevent a business man from manufacturing and selling the best structure he is able to make with the least expenditure of money. The patent law was intended as a thing to be helpful by encouraging genius to invent. It gives the monopoly for seventeen years as a reward for the service so rendered by that genius. If a patent like this were to be held valid, and then by the rule of equivalents the claims were interpreted broadly, the patent law would become a menace to business. Here is an art which prior to Shurtleff had been crossed and recrossed in every direction by prior patents and prior uses until any mechanic who wished to travel in the art could visit any of the places on the Shurtleff map. There may be some coal mines and gas wells still concealed which may later be discovered in this art for the benefit of the world, but the surface of the art was thoroughly developed, and all of these things which Shurtleff claims to have discovered were lying around on the surface of the art, in plain view of all the mechanics who traveled the old, well-known roads. It is possible to cross this continent by combining many old and well-known routes. Applying further the analogy, Shurtleff says he disclosed a new route because he journeyed two miles west on route 1, then north seven miles on route 2, then west ten miles on route 3, and in this manner finally crossed the old continent, through old roads all the way, but he insists that he is a discoverer because no traveler can be found who took exactly the same turns throughout the entire journey. Such a traveler is not a discoverer, but, at best, a guide. Such a builder is not an inventor, but, at best, a good mechanic.

Plaintiff complains because of the large number of prior patents pleaded by defendant as anticipation. In a large measure this was made necessary by the fact that the patent in suit is for an aggregation of old things, well known in the art. If the traveler who crosses the continent by using many old roads claims to have discovered a new route, it would be necessary in order to disprove his claim to show each and all of the routes he had used to be old and well known.

If we ignore those unimportant details of the patent, which fall within the province of the mechanic, and give to plaintiff the broad invention claimed, it would be for a fan, the radiator above the fan, and a vertical discharge of air. Of course, there must be an intake for the air, and there must be a by-pass for cool air when it is not desired to pass the fresh air through the radiator. All of these things standing alone were very old in the art if that word "art" is used as applicable to the heating and ventilating art, as it should be. See United States patents: Horton, 245,379 of 1881; Powers, 558,610

of 1896; Corbin, 593,737; Andrews, 946,-911 of 1910; Geissinger, 1,022,188 of 1912; Kuntz, 1,104,680 of 1914; McGinniss, 1,218,-880 of 1917; Berry, 1,295,416 of 1919; Miles, 1,343,330 of 1920; and Baetz, 1,488,225, filed May, 1920, issued 1924. See, also, such patents as British patent to Guerten, No. 155,306 of 1920. The patent law does not recognize one art for cold water faucets and another art for hot water faucets. They are both in the plumbing art. Speaking of the heating and ventilating art, we find the elements of this claimed combination in almost every conceivable arrangement. It was old to place the radiator between the outside air intake opening and the fan, and in that manner cause the fan to suck the air through the radiator. It was also equally old and well known to place the fan between the intake opening and the radiator and blow the air through the radiator. The fan had been placed above the radiator and it had been below the radiator. Some had made the intake for fresh air below the radiator and others had placed the intake above the radiator. The prior art had usually placed the whole unit on the floor, but some had hung the unit on the wall. The radiators had usually been made of cast iron, but radiators had been used which were made of pressed steel and others were made of copper. See such patents as the British patents heretofore referred to and also United States patent to Briscoe, No. 858,-258 of 1907; Pease, No. 1,291,632 of 1919; and Soule, No. 1,510,807 filed October, 1920, and issued October, 1924; and Harrison, No. 1,530,559, filed April, 1919, and issued March, 1925. I might also refer to the publication by the German firm of Maschinenfabrik Cg-Kiefer and the French firm of Lecomte & Roze. All of these units had been made with jackets or casings in order to better suck and drive the air along the desired route. In this art, steam or hot water is forced through the radiator for the purpose of heating the air current as it passes over the surface of the radiator. It had been taught in this art prior to Shurtleff that the radiator of the automobile, which used the air around the radiator to cool the water within, could be used in this art to heat the air surrounding the radiator. Shurtleff picked this aggregation of old elements and grouped them together. Plaintiff urges that it be called a patentable combination. To do this would be committing the error which I have attempted to illustrate. Because a traveler journeys over many old roads in crossing the continent, he should not be declared a discoverer, even though no prior traveler had turned from each old road to the other old road at the particular turning places. The many patents, uses, and publications pleaded from the prior art disclose all that is useful in Shurtleff. The prior art is so filled with similar structures that it would be useless to refer to them by name. For example, take that element of the claims described as high velocity vertical discharge of air against the ceiling. That was old. There were many disclosures of this feature. The very piano box type of unit heating and ventilating which Shurtleff was making when he applied for this patent and for years previous thereto had a high velocity vertical discharge against the ceiling. That had been discovered years before. Undoubtedly it produced some new and useful result, but Shurtleff came too late to get any credit for it. Where competition is very great, as it has been in this art, an inventor is often seeking more for refinements which will help his concern in making sales by boosting talk and advertising than he is for something which will be of particular service to mankind. It seems to be as desirable to have a unit which can be sold to a school board as it is to have one which will furnish fresh air to the children and keep them warm. In the claims in suit we have as one element the fan below the heating radiator. The testimony and the advertising might convince one that this was a great advantage. As usual, it is here claimed by the plaintiff that this invention has revolutionized the art. Since Shurtleff applied for this patent with the fan below the radiator, plaintiff has devised what it claims to be an equally good or better unit with the fan above the radiator. Plaintiff is now selling as many of the units with the fan above the radiator as it is selling with the fan below the radiator. The fan had been in every conceivable place before the time of Shurtleff. All of these things shown by Shurtleff are things which a mechanic in this art ought to be permitted to use without interference by Shurtleff, because Shurtleff did not invent them. The arrangement of these old things is for the mechanic. He will vary their arrangement and position somewhat to fit the outside temperature furnished by the climate in the particular location and by the temperature desired on the inside, the use to be made of the particular room, and by many other things, including the advertising which the particular concern wishes to use in making sales to the gullible American people.

It does not matter whether Shurtleff thought, through his own initiative, to use a so-called light-weight radiator like the one used in the automobile, or whether someone

708

else gave him the suggestion. The knowledge and use were old in the art. The defendant was the first to make extensive commercial use of the so-called light-weight radiator. The defendant first used the copper radiator by installing it in the same place where the cast-iron radiator had been used in the old piano type unit. This made a satisfactory heating and ventilating unit. I have not heard any criticism of the old piano type unit which was in use long before Shurtleff except that it took up too much room. It was just as good as the modern unit so far as heating and ventilating a room was concerned. It does extend farther out in the aisle. It pulls the air in from the outside, heats it, and shoots it vertically to the ceiling. There has been some testimony about the noise made by different units. That has no place in this lawsuit, for surely Shurtleff did not solve any problem about noise. He was laboring under the impression that he wanted resistance. He got resistance by starting the cold air in one passageway, then having it turn and pass transversely through the radiator and then make another turn so that it could go vertically to the ceiling. The resistance and the turning of the air current would tend to make a buzzing sound. Shurtleff wasted one perfectly good highway over which the air traveled in his device. There was no occasion for having three roads, two of which roads were vertical and parallel to each other and the third road cutting across transversely from one of the vertical roads to the other. The device would have worked much better as defendant built the unit with the road for the air to travel leading directly up through the radiator and out the top of the casing of the unit. By having the transverse current of air, Shurtleff not only wasted one passageway, with the result that the unit was larger than was necessary, but he caused unnecessary noise and created the necessity for more fan power than otherwise would have been required.

The art with which we are dealing is not a difficult one to understand. It has to do with taking pure air from the outdoors, heating it, and delivering it into the room so that the room will be supplied with fresh air and kept at the proper temperature. A so-called unit heater and ventilator does not attempt to dispose of the foul air in the room. By forcing the fresh air into the room, the air of the room is naturally placed under slight pressure, and it is left to this air under pressure to find its own way of escape from the room. The principles involved are all easily understood. If the case has presented any difficulty, it results from the fact that all the things which Shurtleff thought he had discovered were old. He described those things which he thought he had discovered in such indefinite and uncertain language that it is possible to make some plausible argument for an interpretation which he never intended. I think it is fair to say that the greatest difficulty is found in determining what he did mean to claim by his indefinite and uncertain language.

In spite of the many defenses, I have decided to dispose of this case on the ground of invalidity. Giving to plaintiff the benefit of having claimed in a proper manner the monopoly for which he asks, then all of these claims now in suit are void because they are old. Those claims are Nos. 1, 3, and 5 of patent No. 1,744,511 and reissue No. 18,-374; and also claims 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, and 34 of reissue No. 18,374.

A decree will be entered dismissing the bill, with costs to be taxed. The foregoing opinion will stand as findings of fact and conclusions of law in conformity with equity rule 70½ (28 USCA § 723).